John Thomas DRAYDEN,
Petitioner–Appellant,

v.

Theo WHITE, Warden, Respondent–
Appellee.

No. 99–15184.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 15, 2000

Filed Nov. 14, 2000

David W. Fermino, Assistant Federal Public Defender, San Francisco, California, for the petitioner-appellant.

Jeremy Friedlander, Deputy Attorney General, San Francisco, California, for the respondent-appellee.

John Thomas Drayden, pro se, Soledad, California, petitioner-appellant.

Before: ALDISERT,[1] GRABER, and FISHER, Circuit Judges.

GRABER, Circuit Judge:

This appeal from the district court's denial of a habeas petition under 28 U.S.C. § 2254 requires us to decide seven issues: (1) whether sufficient evidence supported Petitioner's conviction for first-degree murder; (2) whether the state trial court's treatment of Petitioner's in-court outburst violated due process; (3) whether the exclusion of two statements by Petitioner's expert witness violated due process; (4) whether the prosecutor's soliloquy, in the voice of the victim, during closing argument violated Petitioner's due process rights; (5) whether the state trial court's instructions on mental state and physical trauma violated due process; (6) whether the California Uniform Instruction on testimony by a single witness violated due process; and (7) whether ineffective assistance of counsel abridged Petitioner's due process rights. We hold: (1) that sufficient evidence supported Petitioner's conviction; (2) that the court's treatment of Petitioner's outburst was consistent with due process; (3) that the exclusion of the expert's statements did not violate due process; (4) that, although the prosecutor engaged in misconduct during the closing argument, Petitioner is not entitled to a new trial because he was not prejudiced; (5) that the court's instructions on mental state and physical trauma complied with due process; (6) that the Uniform Instruction on a single witness' testimony did not violate due process; and (7) that Petitioner's counsel was not constitutionally deficient. Therefore, we affirm the district court's order denying the petition for a writ of habeas corpus.

## FACTS AND PROCEDURAL BACKGROUND

Petitioner John Thomas Drayden met Jerry Quinton on the night of December 28, 1989, and the two went to Quinton's apartment. Quinton apparently hoped to have sex with Petitioner; Petitioner apparently hoped to use Quinton's phone. Instead, Petitioner beat Quinton, rendering him unconscious, and then strangled him to death with an answering machine cord and a coat hanger.

After killing Quinton, Petitioner remained in the apartment, where he show-

---

1. The Honorable Ruggero J. Aldisert, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

ered, changed clothes, and searched the premises. He eventually departed, taking with him several items of Quinton's property, including Quinton's ATM card and Quinton's car. Petitioner drove the stolen car to San Luis Obispo and Santa Barbara, where he used the ATM card 18 times to withdraw more than $6,000 from Quinton's bank account. He then abandoned the car and flew to Hawaii, where police located him two weeks later. At the time, Petitioner was in a hospital, recovering from a suicide attempt. He confessed to killing Quinton, and he does not challenge here the voluntariness of that confession.

Petitioner was charged in state court with first-degree murder, first-degree burglary, and 18 counts of second-degree burglary. At his first trial, in 1991, the jury hung on the murder charge, found Petitioner guilty on all 18 counts of second-degree burglary, and found Petitioner not guilty of first-degree burglary and first-degree robbery, instead convicting him of the lesser-included offenses of grand theft of a vehicle, theft of personal property, and petty theft.

Petitioner's second trial on the murder charges took place in January and February of 1992. Because Petitioner had admitted killing Quinton, the focus of the trial was on whether evidence of premeditation and deliberation would substantiate a conviction for first-degree murder instead of second-degree murder. The jury convicted Petitioner of first-degree murder. Petitioner's claims in this appeal relate only to events during the second trial.

On March 5, 1992, the state trial court sentenced Defendant to an indeterminate term of 25-years-to-life for the murder, plus an additional year for using a deadly weapon. That sentence was consecutive to the sentence that the trial court had imposed on the burglary convictions after Defendant's first trial. In the aggregate, Defendant was sentenced to a term of between 31-2/3 years and life in prison.

Petitioner appealed to the California Court of Appeal, which affirmed his conviction. After the California Supreme Court denied review, Petitioner filed a motion for a writ of habeas corpus with that court, which the court also denied. On June 27, 1994, Petitioner filed a petition for a writ of habeas corpus in federal district court. The district court denied the petition four years after it was filed, on July 10, 1998. That denial is the subject of this appeal.

Petitioner applied for a certificate of appealability (COA) on each of the seven issues that he had raised in his petition. The district court construed that application as an application for a certificate of probable cause (CPC) and granted it without specifying which issue, or issues, the CPC covered. Petitioner then filed this appeal.[2]

## STANDARD OF REVIEW

This court reviews de novo a district court's decision to deny a petition under 28 U.S.C. § 2254. *McNab v. Kok,* 170 F.3d 1246, 1247 (9th Cir.1999) (per curiam). Because Defendant filed his petition before the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), the provisions of AEDPA do not apply to the merits of this appeal. *Ainsworth v. Calderon,* 138 F.3d 787, 790 (9th Cir.), *amended on denial of reh'g,* 152 F.3d 1223 (9th Cir.1998). However, AEDPA's procedural requirements do apply because Defendant filed his notice of appeal after AEDPA's effective date. *Slack v. McDaniel,* 529

**2.** In *Slack v. McDaniel,* 120 S.Ct. 1595, 1603 (2000), the Supreme Court held that the Antiterrorism and Effective Death Penalty Act governs the procedural aspects of habeas appeals filed after the Act's effective date. Consequently, the district court erred when it granted Petitioner a general CPC instead of a COA for each issue approved for appeal. In

this case, because Petitioner specifically requested a COA for each of the seven issues that he raises in this appeal, and the state answers each of the issues on the merits without raising a procedural objection, we treat the CPC as if it were a COA for each of the seven issues raised.

**709**

U.S. 473, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000).

The errors that Petitioner alleges in the trial process itself are "trial errors," as distinct from "structural defect." *Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "[A] federal court may grant habeas relief based on trial error only when that error had substantial and injurious effect or influence in determining the jury's verdict." *Calderon v. Coleman,* 525 U.S. 141, 145, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998) (citations and internal quotation marks omitted). "If we are in grave doubt as to whether the error had such an effect, the petitioner is entitled to the writ." *Coleman v. Calderon,* 210 F.3d 1047, 1051 (9th Cir.2000).

## DISCUSSION

### A. *Sufficiency of the Evidence*

Petitioner argues, first, that there was insufficient evidence of premeditation and deliberation to support the jury's verdict of first-degree murder. In a pre-AEDPA federal habeas case, a court faced with a claim of insufficiency of the evidence considers only whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). "[T]he prosecution need not affirmatively 'rule out every hypothesis except that of guilt'; and ... a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record— that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright v. West,* 505 U.S. 277, 296–97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (quoting *Jackson,* 443 U.S. at 326, 99 S.Ct. 2781).

As noted, Petitioner admitted killing Quinton, and the trial focused on the circumstances of the killing and on Petitioner's mental state. The prosecution alleged that he had acted with premeditation and deliberation. Petitioner contended that he had acted in a fit of spontaneous rage, when Quinton's sexual advances triggered a memory of childhood sexual abuse by Petitioner's mother.

Petitioner testified in support of his version of the killing and also offered expert testimony to substantiate his theory. On behalf of the state, the medical examiner testified that Quinton was unconscious but alive when Petitioner strangled him. The examiner noted that Petitioner had wrapped the answering machine cord around Quinton's neck five times and had "nicely wound one [loop] on top of the other," in a carefully constructed stack. He also testified that the loose end of the cord had been tucked neatly under the coil of cord and described this technique as a "deliberate act." Finally, the examiner testified that, after strangling Quinton with the cord, Petitioner also strangled him with a wire coat hanger.

Two reasons persuade us that sufficient evidence supported Petitioner's conviction for first-degree murder. First, in California, when manner-of-killing evidence strongly suggests premeditation and deliberation, that evidence is enough, by itself, to sustain a conviction for first-degree murder. *People v. Hawkins,* 10 Cal.4th 920, 957, 42 Cal.Rptr.2d 636, 897 P.2d 574 (1995). Here, the evidence as to the manner in which Petitioner killed Quinton was sufficient to sustain Petitioner's conviction. The jury reasonably could have found that Petitioner formed the intent to kill Quinton after he knocked him unconscious and then carefully, deliberately, and coldly acted on that intention. The medical examiner's testimony suggested that Petitioner's actions were methodical, not hasty. Although that evidence does not *compel* a finding of premeditation and

deliberation, it is *sufficient* to sustain such findings.

■ Second, California law recognizes that premeditation can occur in a short period of time, provided that the evidence demonstrates "cold, calculated judgment" on the part of the killer. *People v. Perez*, 2 Cal.4th 1117, 1127, 9 Cal.Rptr.2d 577, 831 P.2d 1159 (1992). In the present case, there was evidence that Petitioner carefully and at length cleaned up after the murder, searched Quinton's apartment, and stole his car and other property. That evidence would permit a reasonable finder of fact to conclude that, in the interval between the time Petitioner knocked Quinton unconscious and the time he strangled him, Petitioner developed a plan to rob Quinton and calculated to kill Quinton in the execution of that plan.

In short, the district court did not err in concluding that there was sufficient evidence of premeditation and deliberation to sustain the verdict.

B. *Petitioner's In–Court Outburst*

Petitioner's mother testified as a rebuttal witness for the prosecution. During her testimony, Petitioner interrupted her. He accused her of lying on the stand and of beating him when he was a child, and he called her an "evil woman," "bitch," and "an evil fucking bitch." Petitioner was removed from the courtroom.

Out of the presence of the jury, the court ruled that Petitioner could reappear in court only if he would wear shackles. Petitioner declined to reappear. The jury was recalled, and the trial court instructed the jurors that they should not consider the fact that Petitioner was absent.

At the start of the proceedings the next day, the trial court instructed the jury, without objection from the defense:

> Yesterday, as I'm sure you all remember, Mr. Drayden made some statements in open court. I remind you that those statements were not under oath, that he was not subject to cross-examination at the time that he made those statements. However, they are statements of the defendant. It is up to you, as the triers of fact, to weigh and value those statements in the same way that you weigh and value any statements of a defendant which are not made—which are admitted into this court not having been made under oath.

Both the prosecution and the defense discussed Petitioner's outburst during closing arguments.

■ Petitioner now argues that the trial court's "admission" of the outburst violated due process by allowing the jury to convict him based on hostility, prejudice, and "character evidence." Assuming that the outburst was "evidence," as the parties assume in their arguments, "the admission of evidence in state court is not subject to federal habeas review unless the admission of the testimony was arbitrary or fundamentally unfair." *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.1986). The improper admission of evidence does not violate the Due Process Clause unless it is clearly prejudicial and "rendered the trial fundamentally unfair." *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1466 (9th Cir. 1986).

■ In this case, even assuming that the trial court erred in instructing the jury that it could consider Petitioner's outburst, the error was neither substantially prejudicial nor egregious enough to render Petitioner's trial fundamentally unfair. The trial court reminded the jury that Petitioner's statements were neither made under oath nor subject to cross-examination and encouraged the jurors to weigh and value the statements accordingly. More importantly, instead of objecting, the defense strategically used the outburst by discussing it at length in closing argument, asserting that it bolstered Petitioner's claim that he was subject to spontaneous rage due to childhood abuse. Finally, notwithstanding Petitioner's arguments to the contrary, it is unlikely that the outburst

prejudiced Petitioner by causing the jurors to think less of him than they did before the outburst. After all, he had testified already that he had killed and robbed Quinton.

In summary, the district court did not err in holding that there was no violation of due process.

### C. *Exclusion of Expert's Statements*

■ Next, Petitioner argues that the trial court violated his due process rights by excluding two statements by Dr. Krener, the defense expert who testified about Petitioner's mental condition. We are not persuaded.

On direct examination, Dr. Krener stated that Petitioner "doesn't have a history of violence." The trial court struck that statement on the ground that it was "in the nature of character evidence." On cross-examination, Dr. Krener stated that, if Petitioner's version of the events were untrue, then "there should be another trail of corpses that I'm sure your team could have unearthed if he had done this before. Because what we know about violent people is that violence occurs recurrently in their lives." The trial court also struck that statement.

■ Assuming that the state trial court improperly excluded those statements, in a federal habeas proceeding we must assess whether the improper exclusion of evidence violated due process by examining "the probative value of the evidence on the central issue; its reliability; whether it is capable of evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative; and whether it constitutes a major part of the attempted defense." *Miller v. Stagner,* 757 F.2d 988, 994 (9th Cir.), *amended on denial of reh'g,* 768 F.2d 1090 (9th Cir.1985).

In this case, the exclusion of Dr. Krener's statements did not violate Petitioner's due process rights. Most importantly, the statements were unreliable and, indeed, were simply wrong. For example, at the time of trial, Petitioner had been charged with committing acts of violence while housed in the county jail awaiting trial. At Petitioner's first trial, a woman who had lived with him testified that he had physically assaulted her, without provocation, twice. Moreover, as the California Court of Appeal acknowledged in its unpublished opinion on Petitioner's direct appeal, the exclusion of Dr. Krener's testimony may in fact have *helped* Petitioner at the second trial because the prosecution otherwise would have been able to impeach her testimony with evidence of Petitioner's other violent acts. In view of the fact that Petitioner did have a history of violence, Dr. Krener's statements to the contrary were not reliable and, under a *Miller* analysis, Petitioner suffered no due process violation because of the exclusion of the statements.

### D. *Prosecutorial Misconduct*

■ During closing argument, the prosecutor said: "One person that was involved in this case did not testify. And he was this man right here, Jerry Quinton. What do you suppose Jerry Quinton would have told you if he could have testified in this case?" Defense counsel interposed an objection, which the trial court overruled. The prosecutor continued: "I'll tell you. And, ladies and gentlemen, hold me to this standard: Everything that I'm going to tell you that Jerry Quinton would have said has been said by somebody for him in this courtroom. All of this is in the evidence." The prosecutor then sat in the witness chair and delivered the following soliloquy:

My name was Jerry Quinton, and I was 48 years old the night that I was strangled to death. I was 58, and I weighed 184 pounds. I lived at 1745 Pacific, Apartment 403. You've seen the diagram up here. It's People's 7. I worked for VISA Corporation. I was an employee for them, and I had taken some time off and come back. And when I came back, as part of my job as

an employee for VISA, I was issued a VISA credit card.

I was gay. One of the things that I liked in a sexual experience was to have a strong, straight-looking black man to perform sex upon. And on this particular evening I went out and found one. I found John Thomas Drayden. I found him coming out of Tosca's, and we started a conversation.

I asked him, in the course of the conversation, to come home with me, and he said "yes." We walked back to my house. It's about a mile from Tosca's. And we had a conversation on the way back about what it was we would do when we got there.

When we got home I walked through the door and I started to hang my coat up, because I was there expecting to have sex. And the next thing I knew I was hit from behind and driven to the floor. I was beaten and I was rendered unconscious. And thank God for that. I didn't know what happened to me next, when Mr. Drayden put that cord around my neck and strangled the life out of me.

I listened to his testimony about how we walked into the living room and I turned on music for him and offered him something to drink and how I made phone calls to BART for him. And that's a lie.

He said he gave me his BART card so I could call the number. That didn't happen. There wasn't a phone number on a BART card. Even had he given it to me, I didn't make phone calls for him. And you know that, because if I had made phone calls for him that telephone would have still been in the living room. And you, members of the jury, could have seen the cord.

If I had turned on the music for him, that tape would have eventually stopped, but the power machine would have still been on when Inspector Bergstrom came and looked in my apartment two

days later. But it was off, because it was never on.

The reason John Drayden was able to use a hanger to strangle me to death is because that hanger was in my hand as I took it out of the closet by the doorway to hang up my coat. And when he hit me, it fell to the ground. If I had been sitting in my living room with somebody that I had picked up to have sex with, I wouldn't sit in that living room for half an hour fully dressed.

Think about it yourselves. You come in out of a winter night. You are with someone, you are going to sit down on a couch and talk to them. Are you going to leave your coat on and a sweater on? I wouldn't. It was warm in there.

And as far as chasing John Drayden to the door, I would rather—I would almost rather be dead than do something like that.

I was a gentle man, not aggressive. I was passive. And if someone said to me when I propositioned them that they didn't want it, that they weren't into that, I would have been embarrassed and mortified and all I would have wanted was to get them out of that apartment as fast as I could.

Ladies and gentleman I was not a fighter. I was a gentle man. And I didn't deserve to have happen to me what he did to me.

Ladies and gentlemen, what he did to me was he murdered me. It was not self-defense. He wasn't angry. I don't know why, having listened to the testimony, he came to my apartment with me. But I do know that the reason that he told you he came there was a lie. And the evidence that was found in the apartment two days later by the police department brands it as a lie.

Petitioner argues that the prosecutor's performance in the role of Jerry Quinton was misconduct. We agree that the prosecutor engaged in misconduct when he delivered a soliloquy in the voice of the victim. By doing so, the Prosecutor inap-

propriately obscured the fact that his role is to vindicate the public's interest in punishing crime, not to exact revenge on behalf of an individual victim. Furthermore, the prosecutor seriously risked manipulating and misstating the evidence by creating a fictitious character based on the dead victim and by "testifying" in the voice of the character as if he had been a percipient witness. Finally, by testifying as Quinton, the prosecutor also risked improperly inflaming the passions of the jury through his first-person appeal to its sympathies for the victim who, in the words of the prosecutor, was a gentle man who did nothing to deserve his dismal fate.

■ Having concluded that the prosecutor's actions constituted misconduct, we now must answer the second, and harder, question: whether the conduct violated Petitioner's due process rights, thus entitling him to a new trial. Petitioner asks us to adopt a per se rule that a prosecutor's "testimony" in the voice of the victim during closing argument violates a defendant's due process rights, a violation that always requires reversal and remand for a new trial. We decline to adopt a per se rule for two reasons. First, we have found no authority for such a rule in the context of federal habeas corpus proceedings that challenge state convictions. Second, in a particular case, a prosecutor's brief excursion into a dramatic role could be wholly innocuous.

■ Instead, we believe that the normal standard of review in federal habeas cases is appropriate. The standard of review for prosecutorial misconduct in federal habeas cases is "the narrow one of due process, and not the broad exercise of supervisory power." *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). A defendant's due process rights are violated if prosecutorial misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright,* 477 U.S. 168, 183, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Courts in federal habeas cases review claims of prosecutorial misconduct "to determine whether the prosecutor's remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Hall v. Whitley,* 935 F.2d 164, 165 (9th Cir.1991) (quoting *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868). That standard allows a federal court to grant relief when the state-court trial was fundamentally unfair but avoids interfering in state-court proceedings when errors fall short of constitutional magnitude.

Reviewing the record in the light of those standards, we cannot conclude that the prosecutor's soliloquy—as deplorable as it was—"so infected the trial with unfairness" that Petitioner suffered a violation of his due process rights. The first and most important reason for our conclusion is that the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence. In other words, had the prosecutor delivered exactly the same speech in the third person, it would have been proper. *See Darden,* 477 U.S. at 181–82, 106 S.Ct. 2464 (noting that the prosecutor did not manipulate or misstate evidence during closing argument). Additionally, before the lawyers made their closing arguments, the court instructed the jury that "[s]tatements made by the attorneys during the trial are not evidence" and that the jury "must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." We presume that the jury followed the instructions. *Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). Third, the evidence of Petitioner's guilt of first-degree murder was very strong: evidence that the murder occurred after Petitioner had rendered Quinton unconscious, physical evidence as to the painstaking method of killing, and evidence of a careful cleanup and extensive robbery. *See Darden,* 477 U.S. at 181–82, 106 S.Ct. 2464 (analyzing a claim that the prosecutor's argument violated due process by considering the

strength of the evidence against the defendant).

In summary, we conclude that the prosecutor's closing argument did not render Petitioner's trial "fundamentally unfair." Therefore, the district court properly ruled that he is not entitled to a new trial.

E. *Instructions on Mental State and Physical Trauma*

▄▄▄ Petitioner next challenges the trial court's instructions on mental state as violative of due process. To prevail on this claim, Petitioner must demonstrate that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

> The court defined "mental disorder" as a disease or affliction of the mind which so greatly affects the rational intellect and interferes with the mental processes that the individual is unable to function within the scope of reasonably normal and socially acceptable behavior in the community.... [T]he term includes any abnormal condition of the mind which substantially affects mental or emotional process and substantially impairs behavior controls.

The court also instructed the jury with the following passage from CALJIC 3.32:

> Evidence has been received regarding physical trauma received by the defendant during or prior to the crime charged in Count 1. You may consider such evidence for the purpose of determining whether or not the defendant actually formed the specific intent and, if applicable, the mental state elements of the crime charged in Count 1....

Petitioner argues that the first instruction violated due process because the phrase "the individual is unable to function within the scope of reasonably normal and socially acceptable behavior in the community" caused the jury to disregard his claim that he was *temporarily* insane by suggesting that he did not have a mental disorder so long as he was able to function in society as a *general* matter. However, the trial court also instructed the jury to consider evidence of Petitioner's mental state *"at the time of the crime."* (Emphasis added.) In view of the latter instruction, a reasonable jury would not have thought that its inquiry into Petitioner's mental state was limited to a generalized consideration of Petitioner's ability to function in society.

▄▄▄ As to the second instruction, Petitioner also argues that the trial court erred in instructing the jury to consider evidence of "physical trauma" without specifying that the jury additionally could consider evidence of "sexual abuse." But in this instance the sexual abuse that Petitioner claimed to have suffered was a form of physical trauma. It is highly unlikely that the jury took the court's instruction to mean that it could consider the evidence that Petitioner had been beaten, but not the evidence that his mother had sexually abused him.

In short, Petitioner's arguments are too speculative to demonstrate that the challenged instructions were defective at all, let alone defective to an extent that violated due process.

F. *Uniform Instruction on Testimony by a Single Witness*

▄▄▄ Petitioner contends that the following instruction, CALJIC 2.27, which the court read to the jury at his trial, violated due process by impermissibly diluting the prosecution's burden of proof:

> You should give the testimony of a single witness whatever weight you think it deserves. However, testimony by one witness which you believe concerning any fact is sufficient for the proof of such fact. You should carefully review all the evidence upon which the proof of such fact depends.

That instruction does not shift the prosecution's burden of proof in any way; it

merely discusses how the jury is to consider the testimony of each witness. The jury was separately and explicitly instructed that the prosecution bore the burden of proving every element of the offense beyond a reasonable doubt. Thus, the jury was properly instructed on the burden of proof, and there was no error.

### G. *Claim of Ineffective Assistance of Counsel*

Finally, Petitioner argues that he received ineffective assistance of counsel. To prevail on that claim, Petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's errors were so serious as to deprive him of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Petitioner identifies five alleged deficiencies in his lawyer's performance: (1) counsel "failed to argue the law" concerning the exclusion of Dr. Krener's testimony; (2) counsel failed to object to the court's treatment of Petitioner's in-court outburst; (3) counsel failed to request an instruction that focused the jury's attention on Petitioner's mental state at the time of the murder; (4) counsel failed to "request the proper version of CALJIC 2.27"; and (5) counsel failed object to the version of CALJIC 2.90 that was given to the jury.

Our discussion above has disposed of claims one through four. Petitioner's fifth argument, that counsel was ineffective for failing to challenge CALJIC 2.90, fails because the United States Supreme Court has upheld the instruction as constitutional. *Victor v. Nebraska,* 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). In sum, Petitioner received constitutionally adequate assistance of counsel.

AFFIRMED.