COLORADO COURT OF APPEALS
 2016 COA 42
 
 

Court of Appeals No. 13CA0043
El Paso County District Court No. 11CR3705 
Honorable Theresa M. Cisneros, Judge

The People of the State of Colorado, 
Plaintiff-Appellee,
v.
Mark David Manyik, 
Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS
Division VII
Opinion by JUDGE BERGER
Richman and Dunn, JJ., concur
Announced March 24, 2016

Cynthia H. Coffman, Attorney General, Jay C. Fisher, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee
Mark G. Walta, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant
 
 
¶1       Defendant, Mark David Manyik, appeals the judgment of conviction entered on jury verdicts finding him guilty of second degree murder, aggravated robbery, and tampering with physical evidence.
¶2       Manyik argues that (1) the prosecutor committed prosecutorial misconduct in opening statement by using the technique of "channeling"[1]; (2) the trial court erred in allowing the prosecution to amend the aggravated robbery charge during trial; (3) the court erred in rejecting his tendered jury instruction about evaluating statements he made to police officers; (4) the court’s jury instruction on the defense of mistaken belief of fact was incorrect; and (5) the court erred in excluding evidence of recorded statements he made during telephone conversations he had with family members when he was at the police station.
¶3       We agree with Manyik that the trial court erred in granting the prosecution’s motion to amend the aggravated robbery charge, and we reverse his conviction on that charge. However, because none of his other contentions provide a basis for reversal, we affirm his convictions for second degree murder and tampering with evidence. 
I. Facts and Procedural History
¶4 Evidence introduced at trial established that the victim had been in a relationship with Traci Adams for part of 2011, but they purportedly broke up around mid-year. Adams then became romantically involved with Manyik, and she moved into his house. However, the victim and Adams remained in contact and continued to socialize.
¶5       The day of his death, the victim was celebrating his birthday with friends. The victim’s friends testified that beginning that afternoon, Adams called the victim ten to twenty times and sent numerous text messages inviting him to Manyik’s house for dinner and sex. She told him then, or had previously told him, that Manyik would not be there because he was on a hunting trip.
¶6       The victim’s friends described the victim as initially reluctant to accept the invitation, but he eventually decided to go. They testified that he left his house around 7 p.m. that night.
¶7       At around 7:40 p.m., Manyik called 911 and reported that he had just shot the victim. A recording of the 911 call was introduced into evidence and played for the jury at trial. During the call, Manyik said that the victim walked into his house and he shot the victim with a shotgun. In response to a question from the 911 operator, Manyik said that the victim was alive and lying outside the house on the front porch or the grass. Manyik also said that he was pointing a pistol at the victim, and throughout the recording, Manyik can be heard repeatedly telling the victim not to move or he would shoot him again.
¶8       When police officers arrived about fifteen to twenty minutes later, they found Manyik standing over the victim and pointing a gun at him. After Manyik was handcuffed and detained, medical personnel attended to the victim, who had suffered a shotgun wound to the abdomen. The victim was transported by helicopter to the hospital and pronounced dead on arrival.
¶9       Police first interviewed Manyik and Adams that night. Manyik said that he did not know that the victim was coming over, and that the victim surprised him when he walked into the house. He said that he and the victim then struggled for his shotgun; during the struggle the victim was shot; and afterward, the victim stumbled out of the house and collapsed near the sidewalk. The police did not immediately arrest Manyik or Adams.
¶10       During the investigation into the victim’s death, the police learned information that cast doubt on Manyik’s and Adams’ initial statements. Most notably, the victim’s friends told police officers that Adams had invited the victim to Manyik’s house the night of the shooting.
¶11       Several days after his first police interview, Manyik was
interviewed again. During his second interview, he admitted that sometime before the victim arrived at his house, Adams had told him that the victim was on his way. In response to the interviewing detective’s question whether Adams "convinced [him] to shoot [the victim]," he replied, "Pretty much." The detective later asked him whether, regarding his plan of "leading [the victim] to the shooting," he had succeeded, to which Manyik responded, "Yeah, probably."
¶12       Additionally, although he had initially told the police that Adams was in the shower when the victim walked in, he said that Adams actually greeted the victim at the door, and only then did the victim walk into the house and see Manyik, who was holding the shotgun. Manyik said that the victim started walking toward him so he raised the shotgun, the victim grabbed it and pushed it down, and then Manyik picked it up and pulled the trigger.
¶13       Manyik also said that after he shot the victim, when he was pointing the pistol at him, Adams searched the victim’s clothing to find the victim’s cell phone. Manyik said that he later disposed of it. The police never recovered the phone.
¶14       Manyik was charged with first degree murder (after deliberation) and conspiracy to commit first degree murder. He was also charged with aggravated robbery and tampering with physical evidence based on the disposal of the victim’s cell phone.[2]
¶15       At trial, Manyik’s theory of defense was self-defense, and he also relied on Colorado’s "make-my-day" statute.[3] The prosecution introduced a substantial amount of evidence, including recordings of Manyik’s police interviews, that tended to disprove his theory by showing that he knew that the victim was coming to his house and he had made preparations in anticipation of his arrival. That evidence included that Manyik had fired a "test shot" with his shotgun about fifteen minutes before the shooting and he had locked his dog in the garage (which the prosecution argued implied that he anticipated an altercation with the victim). When the detective asked Manyik during the second interview about the test shot, Manyik said if the victim did show up at his house, he was "gonna be damn ready."
¶16       There was also evidence that Manyik shot the victim outside his house, not inside, thus rendering the make-my-day statute inapplicable. See § 18-1-704.5(1), C.R.S. 2015. No evidence of the victim’s blood was found inside the house, and a police detective testified that the layout of the house made it impossible for the victim to have been shot inside the house in the way Manyik described. The detective also testified that although there was a hole in one of the walls in the house that could have been made by the butt of Manyik’s shotgun, the hole’s location was not consistent with Manyik’s description of the gun firing while he struggled with the victim over the gun.
¶17       The prosecution further introduced evidence that the day before the shooting, Adams and Manyik reported to the police that an unknown person had been on Manyik’s property, pointing to footprints near Manyik’s house that they said they had found. They told police officers that they believed the victim was the trespasser. Manyik told the responding officer that if he saw the person who had been on his property again, he would shoot him, and Manyik left a message for another officer saying that the victim was going to "end up with a 12-gauge in his belly."
¶18       One of the officers testified that he had explained the make-my-day law several times to Manyik and Adams, and he had specifically informed them that the intruder had to make an unlawful entry into a dwelling for the property owner to lawfully shoot him. Based on this and other evidence, the prosecution argued that Manyik and Adams had conspired to kill the victim and make it appear like a justified shooting.
¶19       The jury acquitted Manyik of conspiracy to commit first degree murder and first degree murder, but it convicted him of the lesser included offense of second degree murder. It also convicted him of aggravated robbery and tampering with physical evidence. The trial court sentenced Manyik to twenty-two years’ imprisonment for murder and to concurrent prison sentences of ten years and six years for aggravated robbery and tampering with physical evidence, respectively.
II. Prosecutorial Misconduct — Improper Channeling of the Victim in Opening Statement
¶20       For a substantial part of his opening statement, the prosecutor assumed the identity of the victim. He began by saying, "My name is [the victim]. I was 55 years old when I was ambushed, murdered and set up by Traci Adams and Mark Manyik, the Defendant."
¶21       The prosecutor then described the victim’s relationship with Adams, the end of the relationship, and the events leading up to the shooting, all in the voice of the victim. Regarding the shooting, he said, "I see Mark raise a shotgun, this 12-gauge shotgun. I look at Mark. I’m scared. I say to him, ‘Mark, please don’t shoot.’ I didn’t stop him. He fired one single 12-gauge round directly into my belly. I fall backwards . . . ."
¶22       The prosecutor went on to narrate, as the victim, Manyik’s and Adams’ actions after the shooting, including speaking with the 911 operator and taking the victim’s cell phone. In the same way, the prosecutor described the police arriving and the victim’s death:
I can hear sirens arriving . . . . I’m still barely alive, but not really conscious. . . . [The] [d]eputy eventually comes up to my near lifeless body. . . . He calls Flight for Life . . . .
A few minutes later the helicopter lands and the medical staff and the police get me into the helicopter, take me to the hospital. Somewhere between that flight from the Manyik residence to the hospital I die.
¶23       The prosecutor then switched to his own voice and point of view, which he used for the remainder of his opening. At no point did Manyik object to the opening statement.
¶24       Manyik argues that the prosecutor’s "channeling" constituted prosecutorial misconduct and requires reversal of his convictions. We agree that the prosecutor’s opening statement was impermissible; however, under the limited circumstances of this case, we cannot conclude that it was plain error.
¶25       In reviewing a claim of prosecutorial misconduct, we engage in a two-step analysis, determining, first, whether the prosecutor’s conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal. Wend v. People, 235 P.3d 1089, 1096 (Colo. 2010). Because defense counsel did not object, we review for plain error. See People v. Estes, 2012 COA 41, ¶19. Plain error addresses error that is both obvious and substantial. Id. It requires reversal "only when there is a substantial likelihood that [the error] affected the verdict or that it deprived the defendant of a fair and impartial trial." People v. Strock, 252 P.3d 1148, 1153 (Colo. App. 2010).
A. Whether the Prosecutor’s Conduct Was Improper
¶26       A party’s opening statement is generally limited to
discussing facts the party intends to prove at trial. People v. Douglas, 2012 COA 57, ¶64. "[D]uring opening statement, a prosecutor may refer to evidence that subsequently will be adduced at trial and draw inferences from that evidence." Estes, ¶23.
 
¶27       While a prosecutor may properly employ a rhetorical device in an opening statement, he may not "thereby induce the jury to determine guilt on the basis of passion or prejudice." Douglas, ¶66 (citation omitted). Prosecutors may not use tactics "calculated to inflame the passions or prejudice of the jury." People v. Dunlap, 975 P.2d 723, 758 (Colo. 1999). The prosecutor’s technique of speaking to the jury in the first person as though he were the victim violated this prohibition.
¶28       In Dunlap, id. at 758-59, the supreme court explained that "golden rule" arguments, "which ask jurors to imagine themselves in the place of the victim," are improper because they constitute "impermissible digressions from the evidence" and have "the potential to incite jurors to reach a verdict on the basis of bias or prejudice." Although no published decision from a Colorado court has specifically addressed the technique of channeling, other courts have likened the practice to golden rule arguments because both techniques are designed to place the jurors in the victim’s shoes by inviting them to view the case through the victim’s eyes. Hawthorne v. United States, 476 A.2d 164, 172 (D.C. 1984); see also People v. Fields, 673 P.2d 680, 700-01 (Cal. 1983).
 
¶29       Like golden rule arguments, channeling is an appeal to the jurors for sympathy for the victim. Fields, 673 P.2d at 701; see also Hawthorne, 476 A.2d at 173 ("[T]he prosecutor’s use of the first-person rhetorical device . . . transformed him into the victim begging for the jury’s sympathy."); Dial v. State, 922 So. 2d 1018, 1022 (Fla. Dist. Ct. App. 2006). The prosecutor’s first-person narrative was "calculated to produce a dramatic and emotional impact on the jury by bringing to life in the courtroom a dead victim," and it served no purpose other than to appeal to the sympathies of the jurors and inflame their passions. State v. Ugalde, 311 P.3d 772, 790 (Mont. 2013) (McKinnon, J., dissenting); see also Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000); State v. Roberts, 838 S.W.2d 126, 130 (Mo. Ct. App. 1992). Such a technique diverted the jurors’ attention from their duty to decide the case on a rational and objective appraisal of the evidence, and instead it incited them to act out of passion or sympathy, "powerful and irrelevant factors which are likely to skew that appraisal." State v. Long, 975 A.2d 660, 675, 678 (Conn. 2009) (citation omitted); see also Domingo-Gomez v. People, 125 P.3d 1043, 1049 (Colo. 2005); People v. Collins, 250 P.3d 668, 678 (Colo. App. 2010).
 
¶30       We disagree with the People that the device used by the prosecutor only outlined the evidence the prosecution would tender at trial and permissible inferences to be drawn from that evidence. Instead, we believe that the opening statement necessarily expressed the prosecutor’s personal opinion about the victim’s thoughts before his death because there was no evidence presented regarding what the victim was actually thinking at that time. See Hawthorne, 476 A.2d at 171.
¶31       For instance, the prosecutor narrated the victim’s thoughts upon arriving at Manyik’s house right before he was shot: "I’m not hiding from anything. I pull up thinking Mark is not home. Thinking only Traci is home. . . . I think I’m invited over there so I don’t feel like — I feel like I can park my car out in the open, which is exactly what I do." The prosecutor then described the victim as "surprised" to see Manyik and "scared" when he saw the shotgun. He also narrated in the victim’s voice what the victim heard and perceived after he had been shot.
¶32       But no evidence was presented, and the prosecutor had no expectation of presenting evidence, regarding what the victim was thinking or feeling right before and after the shooting. Consequently, such statements were not mere references to the evidence that would be introduced at trial. Rather, "by creating a fictitious character based on the dead victim and by ‘testifying’ in the voice of the character as if he had been a percipient witness," the prosecutor manipulated and misstated the evidence. Drayden, 232 F.3d at 713.
¶33       The character the prosecutor created based on the victim was presented as an eyewitness to the murder; the prosecutor essentially purported to give actual testimony on behalf of the victim. See Ugalde, 311 P.3d at 793 (McKinnon, J., dissenting). Because the statements during opening reflected the prosecutor’s personal opinions about what the victim might have said had he been able to appear as a witness, the technique also ran afoul of the longstanding prohibition against a prosecutor expressing his belief in the guilt of a defendant. See id. at 792-93; see also Collins, 250 P.3d at 678. Moreover, as Manyik had no way to cross-examine the fictitious witness created by the prosecutor, the prosecutor’s opening statement risked infringing Manyik’s constitutional right of confrontation. See Ugalde, 311 P.3d at 792 (McKinnon, J., dissenting); see also People v. Cook, 2014 COA 33, ¶35.
¶34       For all these reasons, the prosecutor’s use of channeling in this case was improper.[4]
B. Whether the Misconduct Warrants Reversal
¶35       Nevertheless, we conclude that there was no plain error under the circumstances of this case. "To constitute plain error, prosecutorial misconduct must be flagrant or glaringly or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." Strock, 252 P.3d at 1152 (citation omitted).
¶36       Ordinarily, for an error to be obvious, the action challenged on appeal must contravene a clear statutory command, a well-settled legal principle, or Colorado case law. People v. Pollard, 2013 COA 31M, ¶40. Although no Colorado case has specifically prohibited channeling, as discussed above, similar golden rule arguments have been expressly disapproved by Colorado appellate courts. See, e.g., Dunlap, 975 P.2d at 759. Additionally, Colorado cases have long held impermissible the use of prosecutorial tactics calculated to inflame the passions or prejudices of the jurors. See, e.g., id. at 758. The prosecutor’s opening statement was clearly such a tactic: "[i]f not intended to inflame the passions of the jur[ors] through an appeal to their sympathies for [the victim], then what was this tactic intended to do?" Ugalde, 311 P.3d at 793 (McKinnon, J., dissenting). "[N]ovelty does not provide a safe harbor for flagrantly improper [tactics]" because "the ‘plainness’ of the error can depend on well-settled legal principles as much as well-settled legal precedents." People v. McBride, 228 P.3d 216, 222 (Colo. App. 2009) (citation omitted).
¶37       But regardless of whether the misconduct was obvious, it was not plain error because it did not "so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." Strock, 252 P.3d at 1152 (citation omitted).
¶38       Whether prosecutorial misconduct requires reversal depends on "the severity and frequency of the misconduct, any curative measures taken by the trial court to alleviate the misconduct, and the likelihood that the misconduct constituted a material factor leading to the defendant’s conviction." Id. at 1153.
¶39       Although the first-person narrative was a substantial part of the prosecutor’s opening statement, he did not repeat the technique during closing. Moreover, most (although not all) of the prosecutor’s statements were supported by the evidence adduced at trial and reasonable inferences therefrom: "[i]n other words, had the prosecutor delivered exactly the same speech in the third person," it mostly "would have been proper." Drayden, 232 F.3d at 713. And, while the narrative as a whole was calculated to appeal to the jurors’ emotions, the prosecutor did not dwell on details that would have aroused the strongest emotional responses, such as the pain and suffering the victim experienced after he was shot and the family and friends he left behind. See Roberts, 838 S.W.2d at 133.
¶40       Additionally, although a limiting instruction by the trial court generally is not sufficient in itself to ensure that misconduct of the type at issue here does not substantially affect the verdict, it is relevant to our analysis that before opening statements, the trial court instructed the jury that "what the lawyers say is not evidence and you cannot consider what the lawyers say for any purpose." The court repeated the same instruction before closing arguments. Absent evidence to the contrary, of which there is none, we presume that the jurors followed the court’s instructions and did not let any sympathy for the victim that was evoked by the prosecutor’s opening statement influence their decision. See People v. Bass, 155 P.3d 547, 552 (Colo. App. 2006). Indeed, the fact that the jury acquitted Manyik of the most serious charge — first degree murder — indicates that the jurors based their verdict on the evidence presented and were not swayed by the prosecutor’s inflammatory appeal to their sympathy for the victim.
¶41       Lastly, there is no substantial likelihood that the opening statement constituted a material factor leading to Manyik’s conviction because there was overwhelming evidence that he did not shoot the victim in self-defense, in defense of others, or in accordance with Colorado’s make-my-day law. As in Dunlap, 975 P.2d at 759, "the nature and quantity of the [prosecution’s] evidence in this case preclude any reasonable possibility that the improper [narrative] diverted the jury’s attention away from the evidence and caused it to arrive at a different verdict than it would have reached absent the improper [narrative]."
¶42        Accordingly, although the prosecutor committed misconduct by channeling the victim in opening statement, the misconduct does not require reversal of Manyik’s convictions.
III. Amendment of Information — Aggravated Robbery Charge
¶43       The prosecution originally charged Manyik with aggravated robbery under section 18-4-302(1)(d), C.R.S. 2015, alleging that he
knowingly took a thing of value, namely: a cell phone, from the person or presence of [the victim], by the use of force, threats, or intimidation, and . . . during the robbery or immediate flight therefrom, possessed an article used or fashioned in a manner to lead any person who was present reasonably to believe it to be a deadly weapon, namely: a handgun, or . . . represented verbally or otherwise that [he] was then and there so armed.
¶44       During trial, the prosecution moved to amend the information to charge aggravated robbery under section 18-4-302(1)(b) and to allege that Manyik
knowingly took a thing of value, namely: a cell phone, from the person or presence of [the victim], by the use of force, threats, or intimidation, and . . . during the robbery or immediate flight therefrom, and by use of force, threats or intimidation with a deadly weapon, namely: a handgun, knowingly put the victim or any other person in reasonable fear of death or bodily injury.
¶45       Defense counsel objected to the amendment, arguing, among other things, that it subjected Manyik to an increased penalty because aggravated robbery under section 18-4-302(1)(b) was a per se crime of violence, but aggravated robbery under section 18-4302(1)(d) was not. Thus, a conviction under section 18-4-302(1)(b) would automatically subject him to a prison sentence between ten and thirty-two years, whereas a conviction under section 18-4302(1)(d) carried a prison sentence of four to sixteen years.
¶46       The trial court permitted the amendment, rejecting defense counsel’s argument that it prejudiced Manyik because it subjected him to a conviction for a per se crime of violence.
¶47       Manyik argues that the trial court erred because the amended information charged a different offense than the one in the original information, and therefore Crim. P. 7(e) precluded the amendment. We agree.
¶48       Crim. P. 7(e) provides:
The court may permit an information to be amended as to form or substance at any time prior to trial; the court may permit it to be amended as to form at any time before the verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.
Thus, after trial begins, an amendment of the information is permissible "only if it [is] one of form, not substance, and only if it [does] not charge a different offense and [does] not prejudice a substantial right of the defendant." People v. Metcalf, 926 P.2d 133, 139 (Colo. App. 1996); see also Cervantes v. People, 715 P.2d 783, 786 (Colo. 1986).
¶49       We conclude that the amendment was impermissible because the amended charge subjected Manyik to mandatory sentencing for a crime of violence, while the original charge did not. Aggravated robbery under section 18-4-302(1)(b) is a per se crime of violence, mandating sentencing under the crime of violence statute. § 18-4-302(4); see also §§ 18-1.3-401(8)(a)(I), -406(1)(a), C.R.S. 2015; People v. Hoang, 13 P.3d 819, 820-21 (Colo. App. 2000). Thus, a conviction under section 18-4-302(1)(b) automatically requires a defendant to be sentenced to "a term of incarceration of at least the midpoint in, but not more than twice the maximum of, the presumptive range provided for such offense." § 18-1.3-406(1)(a).
¶50       Conversely, aggravated robbery under section 18-4-302(1)(d) is not a per se crime of violence, and a defendant convicted of aggravated robbery under that subsection is subject to sentencing under the crime of violence statute only if the prosecution pleads and proves a separate violent crime count. Hoang, 13 P.3d at 821.
¶51       Manyik was convicted of aggravated robbery under section 18-4-302(1)(b), so the trial court was required to impose a prison sentence of at least ten years, and it could have imposed a sentence of up to thirty-two years. § 18-1.3-401(1)(a)(V)(A), (8)(a), (10)(a), (10)(b)(IX). But had the amendment not been made and had Manyik been convicted of aggravated robbery under section 18-4-302(1)(d), the court could have imposed a prison sentence of as few as four years, and it could not have imposed a sentence over sixteen years. § 18-1.3-401(1)(a)(V)(A), (10)(a), (10)(b)(IX). Thus, the amended information charged a more serious offense than that which was originally charged.
¶52       Because an amended information which charges a more serious crime necessarily charges an additional or different offense within the meaning of Crim. P. 7(e), the amendment was impermissible. Cf. People v. Rodriguez, 914 P.2d 230, 259 (Colo. 1995) (holding that a jury instruction listing additional modes of sexual penetration than those listed in the information did not impermissibly amend the charge of sexual assault because, in part, "the added modes of sexual penetration [did] not change the applicable statute, sentence, or level of offense.") (emphasis added).
¶53       A division of this court reached the same conclusion in People v. Johnson, 644 P.2d 34 (Colo. App. 1980). In Johnson, the information initially charged the defendant with the elements of third degree assault, but the trial court granted the prosecution’s motion during trial to amend the information to change the elements charged to those of second degree assault. Id. at 37. The division held that "[b]ecause the amended information charged a different and more serious offense than that which was originally charged, the amendment should not have been permitted." Id. at 38.
¶54       The People challenge this conclusion, arguing that because aggravated robbery under either subsection is a class 3 felony with a maximum possible sentence of thirty-two years, the amended information did not charge a different crime than the original. They rely on People v. Butler, 929 P.2d 36, 38-39 (Colo. App. 1996), where the trial court permitted the prosecution to amend the information during trial to change the statutory reference on the charged habitual criminal counts. The original statutory reference was to a statute that provided a potential prison sentence of three times the maximum of the presumptive range if a defendant previously had been convicted of two felonies, whereas the statutory reference after the amendment was to a statute that provided a potential sentence of four times the maximum if a defendant had previously been convicted of three felonies. Id.
 
¶55       A division of this court held that the amendment was permissible, emphasizing that "the language of the charge is the controlling factor in determining the offense charged, and the statutory reference is considered immaterial and subject to amendment as a matter of form." Id. at 39. Because the information charged the defendant with three habitual criminal counts, the division concluded that even before the amendment, the defendant had been charged with having committed three prior felonies under the statute providing for the harsher penalty, regardless of the fact that the original statutory reference was to the statute providing for the less severe penalty for two prior felonies. Id. The division thus concluded that the amended information did not charge an additional or different offense. Id.
 
¶56       Before the amendment here, however, Manyik did not face an aggravated robbery charge that subjected him to automatic sentencing under the crime of violence statute. Moreover, because the prosecution did not plead a separate crime of violence count, a conviction on the original aggravated robbery charge could have subjected Manyik to a maximum prison sentence of only sixteen years. Therefore, the original information did not charge the more serious aggravated robbery offense carrying a minimum sentence of ten years and a potential sentence of thirty-two years, but rather charged the less serious aggravated robbery offense carrying a presumptive sentence of four to sixteen years.
¶57       Accordingly, the amendment impermissibly resulted in the charging of a different offense, and Crim. P. 7(e) precluded it. We therefore reverse Manyik’s conviction for aggravated robbery and remand for a new trial on that charge.
 
 
IV. Tendered Defense Instruction on Manyik’s Statements to the Police
¶58       At trial, defense counsel elicited testimony from Manyik’s friends and family that he suffered an unspecified injury that required hospitalization several years before the shooting.5 The witnesses testified that Manyik was different after the injury: they testified that his thought processing was slower, he had a hard time focusing, and he would lose track of conversations and stories he was telling.
¶59       Defense counsel also elicited testimony that Manyik had a problem with alcohol, and there was some evidence that he was intoxicated when he killed the victim.
¶60       Based on the evidence regarding how Manyik had changed after the injury, defense counsel argued in closing argument that Manyik might have made certain inculpatory statements in his police interviews not because they were true, but because he was confused. Defense counsel emphasized that such confusion was evident in the video recording of Manyik’s second interview.
¶61       Defense counsel also argued that the difference in Manyik’s demeanor between the first and second police interviews was not, as the prosecution argued, due to his realization in the second interview that the police did not buy his story about a justified shooting. Rather, according to defense counsel, the difference could be explained by the fact that he was intoxicated and full of adrenaline during the first interview but not the second, and that the police detectives used more aggressive and manipulative interrogation techniques during the second interview (an argument that was based on testimony defense counsel had elicited from one of the interviewing detectives).
¶62       Defense counsel tendered the following jury instruction:
When considering statements made by Mr. 
Manyik in this case, you may consider the physical and psychological environment of the interrogation when determining the credibility and accuracy of his statements. This includes the facts presented that Mr. Manyik had been drinking prior to the first interview, has a head injury which prevents him from understanding complex circumstances and questioning, and the fact that he was subject to interrogation by a highly trained team of interrogators who used proven techniques including threats and deception to elicit his statements.
¶63       Defense counsel argued that the instruction was necessary because it specifically informed the jury that it should analyze the meaning of Manyik’s statements during the interviews in light of the factors that influenced them. The trial court rejected the instruction, concluding that the standard credibility of witnesses instruction adequately covered the substance of the tendered instruction. The court accordingly instructed the jury:
You may have to decide what testimony to believe. You should carefully consider all of the testimony given and the circumstances under which each witness has testified. Consider each witness’ knowledge, motive, state of mind, demeanor, and manner while on the stand. Consider the witness’ means of knowledge, ability to observe, and strength of memory. Consider also any relationship each witness may have to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case. You should consider all facts and circumstances shown by the evidence which affects the credibility of the witness’ testimony. You may believe all of the testimony of a witness, or part of it, or none of it.
¶64       Manyik now argues that the trial court erred in rejecting his tendered instruction. We disagree.
¶65       A trial court has the duty to correctly instruct the jury on all matters of law applicable to the case. People v. Lucas, 232 P.3d 155, 162 (Colo. App. 2009); People v. Pahl, 169 P.3d 169, 183 (Colo. App. 2006). We review de novo whether the jury instructions as a whole accurately informed the jury of the governing law. Lucas, 232 P.3d at 162. However, we review the trial court’s decision regarding whether to give a particular jury instruction for an abuse of discretion. People v. Oram, 217 P.3d 883, 893 (Colo. App. 2009), aff’d, 255 P.3d 1032 (Colo. 2011). The court abuses its discretion only "when its decision is manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding or application of the law." People v. Orozco, 210 P.3d 472, 475 (Colo. App. 2009).
¶66       Defense counsel asserted that the tendered instruction was based on the United States Supreme Court’s decision in Crane v. Kentucky, 476 U.S. 683 (1986). Crane held that if a defendant’s confession to police is introduced at trial as evidence of guilt, the constitutional right to present a defense prohibits a trial court from excluding evidence bearing on the circumstances under which the confession was made. Id. at 690-91. The Court explained that evidence surrounding the making of a confession, such as the physical and psychological environment that yielded it, bears on its credibility and probative weight, and thus such evidence may have substantial relevance to the ultimate factual issues of the defendant’s guilt or innocence. Id. at 688-89.
¶67       The Court emphasized that if a defendant could not introduce evidence regarding the circumstances that prompted his confession, he would be "effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" Id. at 689. Thus, because "a defendant’s case may stand or fall on his ability to convince the jury that the manner in which [his] confession was obtained casts doubt on its credibility," in the absence of any valid state justification, courts cannot exclude evidence relating to this type of evidence. Id. at 688-89.
 
¶68       Manyik argues that the credibility instruction given by the court applied by its terms only to testifying witnesses and nothing in the instruction suggested that the jury should apply it to a non-testifying defendant’s out-of-court statements. He thus contends that none of the given instructions informed the jury, consistent with Crane, that it could consider the physical and psychological environment that yielded Manyik’s confession in assessing its strength and reliability.
¶69       We agree with Manyik that the plain language of the credibility instruction given by the trial court applied only to testifying witnesses. See People v. Loggins, 981 P.2d 630, 636 (Colo. App. 1998). We nevertheless reject his argument that the court reversibly erred in rejecting the tendered instruction. We may affirm the court’s ruling on any ground supported by the record, even if that ground was not articulated or considered by the court. See People v. Gonzales-Quevedo, 203 P.3d 609, 612 (Colo. App. 2008).
¶70       Crane’s holding applies to a defendant’s ability to present evidence; it does not address or govern the right to receive a specific jury instruction. Consequently, Crane did not require the trial court to give the tendered instruction or indeed to give any instruction that informed the jury what factors to consider in evaluating Manyik’s statements to the police.
¶71       Moreover, a trial court "has no duty to, and should not, select the salient points in the evidence, favorable or unfavorable, and specifically call them to the attention of the jurors." Wertz v. People, 160 Colo. 260, 262, 418 P.2d 169, 170 (1966) (citation omitted). Instructions emphasizing specific evidence generally are improper because they "tend to confuse the jury and result in incorrect directives regarding evidentiary weight." Krueger v. Ary, 205 P.3d 1150, 1157 (Colo. 2009). The tendered instruction emphasized only selective evidence that was favorable to Manyik, and thus it was improper.
¶72       Accordingly, we cannot say that the court abused its discretion in rejecting the tendered instruction.
V. Mistaken Belief of Fact Instruction
The trial court instructed the jury that "[i]t is an affirmative defense to the crime of first degree murder that Mr. Manyik engaged in the prohibited conduct under a mistaken belief of fact which supports a defense or justification as defined in instructions number 19 [self-defense], and 20 [make-my-day defense]."
¶73       Manyik argues that this instruction failed to fully and correctly instruct the jury on his defense of mistake of fact, which was based on his mistaken belief that the victim had not been invited to his house, and that it did not effectively communicate to the jury the manner in which his mistake of fact defense interacted with and buttressed his self-defense and make-my-day defenses.
¶74       Defense counsel did not object to the instruction, and we thus review for plain error. Hagos v. People, 2012 CO 63, ¶14. We conclude that the instruction did not constitute error, much less plain error.
¶75      
Section 18-1-504(1), C.R.S. 2015, governs the defense of mistaken belief of fact and provides, as relevant here:
A person is not relieved of criminal liability for conduct because he engaged in that conduct under a mistaken belief of fact, unless: . . . (c) The factual mistake or the mental state resulting therefrom is of a kind that supports a defense of justification as defined in sections 18-1-701 to 18-1-707 [including the self-defense and make-my-day statutes].
 
¶76       Jury instructions framed in the language of a statute are generally considered adequate and proper. People v. Hayward, 55 P.3d 803, 805 (Colo. App. 2002). The language of the instruction given here was almost identical to the language in section 18-1504(1)(c). It thus was proper.
¶77       Additionally, even if we were to assume that the trial court’s mistaken belief of fact instruction did not sufficiently inform the jury how to evaluate Manyik’s affirmative defenses in relation to each other, defense counsel argued during closing that Manyik’s mistaken belief that the victim had not been invited to his house supported his self-defense and make-my-day defense. Specifically, counsel argued that due to Manyik’s mistaken belief that the victim was not invited, Manyik reasonably believed that the victim entered his house because the victim intended to hurt him or Adams.
¶78       The jury therefore was aware of Manyik’s mistake of fact defense, and even if there was error in the mistake of fact instruction, it was not substantial: it did not so prejudice Manyik "as to cast serious doubt on the reliability of the judgment of conviction." People v. Miller, 113 P.3d 743, 750 (Colo. 2005) (citation omitted).
 
VI. Recording of Manyik’s Phone Calls
¶79       Certain portions of the recording of Manyik’s second police interview were redacted before the recording was introduced at trial and played for the jury. Defense counsel had argued against the redactions, which deleted a part of the recording in which Manyik had been left alone in the interview room at the police station and had made a number of calls on his cell phone to his family members. His statements during those calls were recorded in the same manner as the interview was, and defense counsel requested that the recording of those statements be played for the jury along with the recording of the interview.
¶80       The trial court denied the request, ruling that many of the statements Manyik made during the phone calls, such as his statement indicating that he did not know that Adams had continued to see the victim after she became involved with Manyik, were hearsay. The court concluded that the statements did not fall under any hearsay exception that would allow for their admission, and they were not admissible under the residual exception to the hearsay rule because they were self-serving and there was nothing to guarantee their trustworthiness. The court thus excluded evidence of the statements.
¶81       Manyik argues that the trial court erred in ruling that the recorded statements constituted self-serving hearsay and were inadmissible at trial. We reject this argument.
¶82       We review a trial court’s ruling on the admission of evidence for an abuse of discretion. People v. Clark, 2015 COA 44, ¶14.
¶83       "Hearsay statements are out-of-court declarations offered into evidence for the truth of the matter asserted." Blecha v. People, 962 P.2d 931, 937 (Colo. 1998). Because a hearsay declarant is not present to explain the statement in context and not subjected to cross-examination, hearsay statements are presumptively unreliable. Id. Hearsay statements therefore generally are not admissible as evidence at trial. Id.; see also CRE 802.
¶84       Manyik concedes that the statements at issue were hearsay, but he argues that they nevertheless were admissible under the rule of completeness. CRE 106 codifies the common law rule of completeness, People v. Melillo, 25 P.3d 769, 775 n.4 (Colo. 2001), and provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." If admitting only one part of a written or recorded statement would be unfair or misleading, the rule of completeness favors admission of other parts of the statement. People v. Muniz, 190 P.3d 774, 787 (Colo. App. 2008).
¶85       Although the statements Manyik made during the phone calls were recorded at the same time as his police interview, they were not part of the interview. They were made when the police detectives had left Manyik alone in the interview room, and the detectives were not involved in the conversations Manyik had with his family members. Thus, admitting the statements was not necessary to give the jury a complete and accurate picture of the admitted police interview, and admitting the recording of the interview with Manyik’s statements from the phone calls redacted was not confusing or misleading regarding the statements he made during the interview itself. See id. The rule of completeness is therefore inapplicable.
¶86       Manyik alternatively argues that the statements were admissible under CRE 803(3), which provides that the rule excluding hearsay does not exclude a statement of a declarant’s then-existing state of mind, emotion, sensation, or physical condition. However, CRE 803(3) expressly does not include statements of memory or belief to prove the fact remembered. Rather, "the statement must describe the declarant’s mental or emotional condition at the time the statement was made." People v. Haymaker, 716 P.2d 110, 113 n.3 (Colo. 1986).
¶87       Most of the recorded statements Manyik made during his telephone conversations were statements that spoke to his mental state in the past, such as statements that indicated that he did not know of Adams’ ongoing relationship with the victim. Others, such as his statements that Adams "was throwing him under the bus," that she had invited the victim over so that Manyik would shoot him, and that she and the victim had been planning to move to Arizona together, not only spoke to a past mental state but also addressed a mental state of someone else. See People v. Madson, 638 P.2d 18, 27-28 (Colo. 1981). Thus, because Manyik’s statements did not relate to his then-existing state of mind, they did not fall under CRE 803(3) and they were inadmissible hearsay. See id. at 27.
 
¶88       Accordingly, the trial court did not abuse its discretion in excluding evidence of the recorded statements Manyik made during telephone conversations he had with his family members when he was in the interview room at the police station.
VII. Conclusion
¶89       Manyik’s conviction for aggravated robbery is reversed, and the case is remanded for a new trial on that charge. In all other respects, the judgment of conviction is affirmed.
JUDGE RICHMAN and JUDGE DUNN concur.

[1] "‘Channeling the victim’ is a technique by which a lawyer speaks to the jury in the first person as though [he] is the injured or deceased person." State v. Ugalde, 311 P.3d 772, 790 (Mont. 2013) (McKinnon, J., dissenting).
[2] Adams was also charged in connection with the victim’s death and the disposal of the cell phone, but she was tried separately.
[3] Section 18-1-704.5(2), C.R.S. 2015, known as the "make-my-day" statute, People v. McNeese, 892 P.2d 304, 309 (Colo. 1995), provides that
any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made an unlawful entry into the dwelling, and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling in addition to the uninvited entry, or is committing or intends to commit a crime against a person or property in addition to the uninvited entry, and when the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant.
[4] We do not address or suggest whether, or to what extent, our analysis is applicable to the use of channeling in civil cases. There are several differences between criminal cases and civil cases in this respect. The pain and suffering of a victim in a criminal case rarely has any relevance, while the pain and suffering of a plaintiff in a civil case may be a material issue. See, e.g., Bushnell v. Sapp, 194 Colo. 273, 281, 571 P.2d 1100, 1105 (1977). Moreover, prosecutors in criminal cases have special obligations not imposed on lawyers in civil cases. See Colo. RPC 3.8.
[5] Manyik was initially tried about three months before the trial at issue here; his first trial ended in a mistrial because of a forest fire. During his first trial, defense counsel attempted to elicit testimony regarding a head injury suffered by Manyik several years prior to the shooting for the purpose of showing that his character had changed after the injury. The trial court ruled that defense counsel could elicit testimony about Manyik’s character but could not ask about the head injury. The trial court issued a similar ruling during the second trial, allowing the witnesses to discuss his character and demeanor after the injury but not the injury itself. Although Manyik discusses this ruling in his argument on appeal and at times seems to imply that it was incorrect, he does not specifically argue that the court erred in precluding evidence regarding his injury. We thus do not further address the court’s evidentiary ruling.