The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
October 10, 2024

## 2024COA110

**No. 22CA0534, *People v. Ramcharan* — Crimes — Unlawful Sexual Behavior — Victim's and Witness's Prior History — Evidence of History of False Reporting — Offer of Proof of Relevancy and Materiality**

Under Colorado's rape shield statute, a party who seeks to introduce evidence of a victim's "history of false reporting of sexual assaults" must file a written motion setting forth "an offer of proof of the relevancy and materiality" of the evidence. § 18-3-407(2), C.R.S. 2023. A division of the court of appeals considers the sufficiency of an offer of proof consisting of a summary of statements of witnesses, with whom defense counsel apparently never spoke, that lacks any explanation of whether the statements are admissible. The division holds that such an offer of proof is insufficient because the proponent did not establish that the witnesses' statements were admissible.

Court of Appeals No. 22CA0534
Jefferson County District Court No. 20CR1024
Honorable Jason Carrithers, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Reynold Ramcharan,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE LIPINSKY
Schutz and Martinez*, JJ. concur

Announced October 10, 2024

Philip J. Weiser, Attorney General, Marixa Frias, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Casey J. Mulligan, Alternate Defense Counsel, Boulder, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     The General Assembly enacted Colorado's rape shield statute, section 18-3-407, C.R.S. 2023, to protect victims of sexual assault from "humiliating and embarrassing public fishing expeditions into their past sexual conduct." *People v. Weiss*, 133 P.3d 1180, 1185 (Colo. 2006) (quoting *People v. McKenna*, 585 P.2d 275, 278 (Colo. 1978)).

¶ 2     To accomplish this goal, the statute limits the introduction of "evidence of specific instances of the victim's . . . prior or subsequent sexual conduct, opinion evidence of the victim's . . . sexual conduct, and reputation evidence of the victim's . . . sexual conduct." § 18-3-407(1), C.R.S. 2023.  (We cite the version of the rape shield statute in effect at the time of the trial in this case.)  Such evidence is presumed irrelevant, with only a few exceptions.

¶ 3     One of those exceptions is evidence that "the victim . . . has a history of false reporting of sexual assaults." § 18-3-407(2), C.R.S. 2023.  But this type of evidence may only be admitted at trial if the party seeking to introduce it follows the procedure specified in section 18-3-407(2)(a)-(g), C.R.S. 2023.

¶ 4     As part of that procedure, the party seeking to introduce the evidence must file a written motion setting forth an "offer of proof of

1

the relevancy and materiality of . . . evidence that the victim or witness has a history of false reporting of sexual assaults that is proposed to be presented." § 18-3-407(2)(a), C.R.S. 2023. The written motion "shall be accompanied by an affidavit in which the offer of proof shall be stated." § 18-3-407(2)(b), C.R.S. 2023.

¶ 5 In this appeal, we consider the sufficiency of an offer of proof consisting of a summary of statements of witnesses, with whom defense counsel apparently never spoke, that lacks any explanation of whether the statements are admissible. We hold that such an offer of proof fails because it does not establish that the witnesses' statements were admissible.

¶ 6 Reynold Ramcharan appeals his judgment of conviction entered on jury verdicts finding him guilty of sexual assault on a child and contributing to the delinquency of a minor. We affirm.

## I.    Background

¶ 7 The evidence introduced at Ramcharan's trial established the following facts.

¶ 8 Ramcharan met A.M., a fourteen-year-old girl, at a public location after she ran away from the Tennyson Center for Children. After A.M. told Ramcharan she had nowhere to live, he said he

might have a place where she could stay, and they walked to his apartment.

¶ 9     Once they reached Ramcharan's apartment, A.M. lay down, fully clothed, in a bedroom.  A.M. testified that Ramcharan entered the bedroom a few minutes later, got into bed with her, removed her pants, held her down, and sexually assaulted her.  She specified that Ramacharan put his penis in her vagina.

¶ 10    A.M. further testified that, either before they entered the apartment or while Ramcharan was holding her down, he told her to smoke methamphetamine using a white pipe.  When she refused, he threatened to hurt her if she would not comply.  A.M. smoked from the pipe.  She later reported that the pipe had a black residue.

¶ 11    She then "got enough strength to push [Ramcharan] off," walked out of the bedroom, told two women who were in the apartment that she needed fresh air, left the apartment, and asked people in neighboring houses to call 911.

¶ 12    A crimes against children detective, Kim Collins, later interrogated Ramcharan.  He denied assaulting A.M., saying that "everything that happened here was completely consensual."  Significantly, however, in response to Detective Collins's question,

"Is [A.M.] telling the truth . . . that you had sex," Ramcharan said, "We started to and that's when I asked" A.M. her age. He said, "[T]hat's when she got uncomfortable, so I stopped."

¶ 13 In addition, Ramcharan "denied having a white pipe" and told the detective that "he did not give [A.M.] meth to smoke." But a police officer later discovered a white pipe containing black residue, as A.M. had described it, in the jacket Ramcharan had worn on the day of the alleged sexual assault.

¶ 14 A DNA test of swabs from A.M.'s vagina, cervix, and external genitalia did not detect semen, but it did contain a male Y-STR profile that was consistent with Ramcharan's genetic material. *See State v. Bander*, 208 P.3d 1242, 1246 (Wash. Ct. App. 2009) ("Based on PCR-YSTR typing, a forensic analyst may determine whether a known source and all of his paternal relatives can be excluded as possible contributors to an unknown DNA sample."). The prosecution's expert witness on DNA analysis testified that, "based on the results of a search of a current population database, the expected frequency of [Ramcharan's] Y-STR profile is approximately 1 in 2,007."

¶ 15    Ramcharan was charged with sexual assault on a child with a use of force enhancer, in violation of section 18-3-405(1), (2)(a), C.R.S. 2024, and contributing to the delinquency of a minor, in violation of section 18-6-701(1)(a), (2)(a), C.R.S. 2024.  A jury found Ramcharan guilty of both crimes, but without the use of force sentence enhancer.  Ramcharan appeals his judgment of conviction.

## II.    Analysis

¶ 16    Ramcharan contends that the court reversibly erred by

(1)    denying his request to introduce evidence of A.M.'s alleged history of false reporting of sexual assaults;

(2)    instructing the jury on the mens rea "knowingly" in a manner that "deviated from the statutory definition"; and

(3)    denying Ramcharan's requests for substitution of appointed counsel.

### A.    Prior False Reports of Sexual Assault

¶ 17    Ramcharan contends that the court reversibly erred by denying his request to introduce "evidence of A.M.'s multiple prior instances of false reports of being sexually assaulted."

¶ 18    Defense counsel filed a pretrial notice of intent to admit evidence of "prior false reports of sexual assault."  In support of the notice, defense counsel submitted a document entitled "affidavit" bearing his signature.

¶ 19    In the "affidavit," defense counsel asserted that he found, in his review of discovery from the district attorney's office, that A.M. "has made previous false accusations of sexual assault."  Defense counsel then summarized statements of witnesses that he found in the discovery materials.  (Nothing in the record suggests that defense counsel ever spoke with any of the witnesses.)  Those statements purported to refer to instances in which A.M. allegedly made false reports of sexual assault.  In addition, defense counsel stated in the "affidavit" that he found "two cases had been filed for reporting a false crime," although defense counsel did not say that A.M. had been charged in those cases with falsely reporting a sexual assault or that A.M. had been convicted in either case.

¶ 20    More importantly, defense counsel's "affidavit" did not indicate whether the witnesses' statements were admissible.  *See Weiss*, 133 P.3d at 1187.  For example, defense counsel did not state whether

the witnesses possessed firsthand knowledge of A.M.'s alleged false reports of sexual assault or whether their assertions were premised on hearsay or on speculation.

¶ 21 At the initial hearing on the defense's request to introduce evidence of A.M.'s alleged prior false reports of sexual assault, the court said it was unsure how the allegations in the "affidavit" fit "in the exception of rape shield" and directed defense counsel to file an addendum to the request. Defense counsel did not file such an addendum.

¶ 22 At a status conference conducted one month later, the court invited the prosecutor to respond to the defense's notice. The prosecutor challenged the notice for four reasons. First, he argued that the supporting "affidavit" was insufficient because "it's not a signed record given under oath." He noted that the "affidavit" was not notarized and did not satisfy the statutory requirements for unsworn declarations. Second, he contended that the witnesses named in the affidavit "would be testifying to hearsay . . . and would have no personal knowledge." Third, he challenged whether the "affidavit" referenced more than one incident of false reporting.

Fourth, he noted that the false reporting charges filed against A.M. had been dismissed.

¶ 23    In response, defense counsel told the court he could "re-file that with . . . having a notary sign it.  I could fix that defect quite easily."  Defense counsel further argued that the "affidavit" described more than one occasion on which A.M. had falsely reported that she had been sexually assaulted.

¶ 24    The court said it was "debatable" whether the document satisfied the affidavit requirement but added that "an attorney's signature [may be] sufficient" under C.R.C.P. 11 and the prosecutor was making a "form over substance sort of argument."

¶ 25    Turning to the merits of the prosecutor's argument, the court concluded that the defense's offer of proof was insufficient, saying that, although defense counsel "assert[s] there's two instances of false reporting," there is "only one regarding a sexual act."  The court also concluded that the offer of proof improperly rested on hearsay.  Accordingly, the court denied, without prejudice, the defense's request for an evidentiary hearing to determine the admissibility of evidence of A.M.'s alleged history of false reporting

of sexual assaults. Although the court said that defense counsel could refile the request, the defense did not do so.

### 2. Standard of Review

¶ 26   We review the construction and interpretation of Colorado's rape shield statute de novo. *See Weiss*, 133 P.3d at 1184. "Our objective is to effectuate the intent and purpose of the General Assembly. We read the statute as a whole, giving sensible effect to all of its parts whenever possible. If the statutory language is clear, we apply the plain and ordinary meaning of the provision." *Id.* (citations omitted).

¶ 27   In addition, "[w]e review a trial court's determination of the admissibility of evidence under the rape shield statute for an abuse of discretion." *People v. Buckner*, 2022 COA 14, ¶ 63, 509 P.3d 452, 464. "A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or is based on an erroneous view of the law." *Id.*

¶ 28   The parties disagree whether the court's denial of the defense's request to introduce evidence of A.M.'s alleged prior false reports of sexual assault could have violated Ramcharan's constitutional

9

rights to confront the witnesses against him and to present a complete defense.

¶ 29　"An erroneous evidentiary ruling may rise to the level of constitutional error if it deprived the defendant of any meaningful opportunity to present a complete defense." *People v. Conyac*, 2014 COA 8M, ¶ 93, 361 P.3d 1005, 1024.  But a defendant's right to present a defense is violated only when "the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *Id.*; *see also Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009) (holding that an evidentiary ruling amounts to constitutional error if it "effectively barred the defendant from meaningfully testing evidence central to establishing his guilt").

### 3.　The Law

¶ 30　Under the rape shield statute, a party can introduce evidence that the victim "has a history of false reporting of sexual assaults" only by adhering to the procedure specified in section 18-3-407(2), C.R.S. 2023:

> (a) A written motion shall be made . . . to the court and to the opposing parties stating that the moving party has an offer of proof of the relevancy and materiality of . . . evidence that the victim or witness has a history of false

10

reporting of sexual assaults that is proposed to be presented.

(b) The written motion shall be accompanied by an affidavit in which the offer of proof shall be stated.

§ 18-3-407(2)(a)-(b), C.R.S. 2023.

¶ 31    Because section 18-3-407(2)(b), C.R.S. 2023, refers to "an affidavit," the document in which "the offer of proof shall be stated" must satisfy the legal requirements for affidavits, *see* C.R.C.P. 108 ("An affidavit may be sworn to either within or without this state before any officer authorized by law to take and certify the acknowledgment of deeds conveying lands."); *Otani v. Dist. Ct.*, 662 P.2d 1088, 1090 (Colo. 1983) ("An affidavit is a signed, written statement, made under oath before an authorized officer, in which the affiant vouches that what is said is true.").  (We look to C.R.C.P. 108 for guidance in the absence of a Rule of Criminal Procedure that addresses affidavits.  *See* Crim. P. 57(b).)  An unsworn declaration that complies with section 13-27-106, C.R.S. 2024, can be used in place of an affidavit.  C.R.C.P. 108.  Section 13-27-106 specifies that unsworn declarations must include the statement, "I

11

declare under penalty of perjury under the law of Colorado that the foregoing is true and correct."

¶ 32    If the court finds that the offer of proof is sufficient, it "shall notify the other party of such." § 18-3-407(2)(c), C.R.S. 2023. If the prosecution disputes the facts described in the offer of proof, the court shall set a pretrial in camera evidentiary hearing, at which "the court may allow the questioning of the victim or witness regarding the offer of proof made by the moving party or otherwise allow a presentation of the offer of proof, including but not limited to the presentation of witnesses." *Id.* "Only if the prosecution stipulates to the facts contained in the offer of proof" may the court rule on the request to introduce evidence otherwise barred under the rape shield statute without an evidentiary hearing. *Weiss*, 133 P.3d at 1187.

¶ 33    An offer of proof is a "preview of the evidence a party is prepared to introduce at an evidentiary hearing" and "consists of allegations that the party's attorney represents would be proven if the court granted the hearing." *People v. Marx*, 2019 COA 138, ¶ 46, 467 P.3d 1196, 1206. An offer of proof "typically states: (1) what the anticipated testimony of the witness would be if the

witness were permitted to testify concerning the matter at issue; (2) the purpose and relevance of the testimony sought to be introduced; and (3) all the facts necessary to establish the testimony's admissibility." *Weiss*, 133 P.3d at 1186-87. "[T]he affidavit accompanying the defendant's offer of proof must articulate facts which, if demonstrated at the evidentiary hearing by a preponderance of the evidence, would show that the alleged victim made multiple prior or subsequent reports of sexual assault that were in fact false." *Id.* at 1184.

### 4. Defense Counsel's "Affidavit"

¶ 34 The division requested supplemental briefing on whether defense counsel's "affidavit" containing Ramcharan's offer of proof satisfied the legal requirements for affidavits or unsworn declarations. The document was neither notarized nor did it expressly say that it was made "under penalty of perjury under the law of Colorado." Although the prosecution argued before trial that, for this reason, defense counsel's submission did not satisfy section 18-3-407(2)(b), C.R.S. 2023, the court did not decide the issue but, instead, concluded that defense counsel had failed to make a sufficient offer of proof under section 18-3-407(2)(a), C.R.S. 2023.

13

The People did not challenge the form of the "affidavit" in their answer brief.

¶ 35     We need not decide whether the document satisfied the affidavit requirement set forth in section 18-3-407(2)(b), C.R.S. 2023, however, because, like the court, we hold that defense counsel failed to make a sufficient offer of proof. *See infra* Part II.A.5. Nonetheless, we are troubled by the deficiencies in the form of defense counsel's "affidavit."

### 5. Ramcharan Did Not Make a Sufficient Offer of Proof Under Section 18-3-407(2)(a), C.R.S. 2023

¶ 36     Next, we hold that Ramcharan's offer of proof was insufficient under section 18-3-407(2)(a), C.R.S. 2023, because he did not provide facts establishing that the witnesses' statements referenced in his "affidavit" were admissible.

¶ 37     As noted above, the "affidavit" consisted of witness statements that defense counsel obtained from discovery materials, as well as his review of two court files in which A.M. was charged with false reporting. Defense counsel did not say he had spoken with any of the witnesses named in the "affidavit."

14

¶ 38    Nothing in the "affidavit" indicated the basis for the witnesses'
alleged knowledge that A.M. had made false reports of sexual
assault or established that the witnesses' statements were
admissible evidence.  Specifically, the "affidavit" stated that Steve
Bailey, A.M.'s guardian ad litem, told Detective Collins that A.M.
"had a history of false reporting," including an "instance where
[A.M.] had made allegations of sexual assault 'that she said
happened in one place when it was known she was somewhere
else.'"  Defense counsel did not indicate how Bailey became aware of
this incident, whether Bailey was merely repeating information he
obtained from others, or whether Bailey could provide admissible
testimony regarding the incident.

¶ 39    The "affidavit" also reported information that Mallory Scott, a
"social worker with Teller County DHS," provided to Detective
Collins, a deputy district attorney, and an investigator with the
district attorney's office.  According to defense counsel, Scott said
that A.M. "had been charged in Teller County for false reporting of
sexual assault."  But the "affidavit" did not indicate how Scott
learned of the charge, whether she possessed any firsthand
knowledge of the facts supporting the charge, or whether A.M. was

15

convicted in the case. The "affidavit" quoted Scott as saying that A.M. was sexually assaulted in 2018; "reported other incidents of sexual assault allegations, including the incident in which she was charged with 'reporting a false crime'"; and "continued to make false reports up until December 2019." Notably, the "affidavit" did not quote Scott as saying that A.M. falsely reported a sexual assault in 2018 or that the "continued . . . false reports" included false reports of sexual assault. According to defense counsel, Scott said that A.M. would "sometimes tell Ms. Scott that a particular assault didn't actually happen," but the "affidavit" did not say that any such "particular assault" was a sexual assault or how many times A.M. allegedly told Scott that "a particular assault didn't actually happen." More importantly, the "affidavit" did not indicate how Scott knew that A.M. falsely reported any sexual assault.

¶ 40    The "affidavit" further said that Scott provided an example where A.M. "went running down a trail near the police station and reported to the first person she saw that she had been sexually assaulted." According to the "affidavit," Scott said that officers found a threatening note in A.M.'s backpack and that A.M. "allegedly admitted that she was the one who wrote that note." But

the "affidavit" did not say that A.M. falsely reported the sexual assault or that Scott possessed personal knowledge of the incident.

¶ 41    Further, the "affidavit" said that, according to Scott, A.M. made a report that "police were able to determine was false by checking surveillance camera footage." The "affidavit" did not explain how Scott knew of the allegedly false report, however.

¶ 42    Finally, the reference to the two court cases in the "affidavit" did not indicate whether either case arose from a false report of sexual assault, whether the false reporting charges filed against A.M. were meritorious, or how evidence of any false reports of sexual assault underlying those cases could be admitted into evidence.

¶ 43    The offer of proof specified in section 18-3-407(2)(a), C.R.S. 2023, requires more than mere allegations that the victim has a history of false reporting of sexual assaults. *See Weiss*, 133 P.3d at 1184. Rather, the offer of proof and the hearing discussed in section 18-3-407(2)(c), C.R.S. 2023, are intended to screen "the evidence proposed to be offered regarding the sexual conduct of the victim." § 18-3-407(2)(e), C.R.S. 2023. The procedures set forth in section 18-3-407(2)(a), (b), and (c), C.R.S. 2023, would be a futile

17

exercise if an offer of proof consisted of inadmissible evidence.  For this reason, the offer of proof must state "all the facts necessary to establish the testimony's admissibility."  *Weiss*, 133 P.3d at 1186-87.

¶ 44    Defense counsel's "offer of proof" fell far short of explaining how any of the allegations of false reporting of sexual assault contained in the "affidavit" were admissible.  Although there is no requirement that the affiant who executes the affidavit required pursuant to section 18-3-407(2)(b), C.R.S. 2023, speak with the witnesses whose statements appear in the affidavit, an affiant's sole reliance on third-party documents to obtain those statements increases the likelihood that a court will determine that the offer of proof fails to establish the statements' admissibility.

¶ 45    The "affidavit" that Ramcharan's counsel tendered to the court does not state that the specified individuals have firsthand knowledge of the allegations or, if not, the basis for their knowledge. If the individuals were merely recounting hearsay — "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," CRE 801(c) — the individuals' statements regarding

A.M.'s alleged history of false reporting of sexual assaults would be inadmissible. *See* CRE 802 ("Hearsay is not admissible except as provided by these rules or by the civil and criminal procedural rules applicable to the courts of Colorado or by any statutes of the State of Colorado."); *see also* CRE 804, 805, 807 (setting forth various exceptions to the general bar against hearsay testimony).

¶ 46 Defense counsel was required to explain in his offer of proof why the witnesses' statements were admissible. Defense counsel's offer of proof failed absent such an explanation.

¶ 47 For these reasons, we conclude that the court did not abuse its discretion by denying Ramcharan's request to introduce evidence of A.M.'s history of false reports of sexual assaults.

## B. Instructional Error

¶ 48 Ramcharan contends that the court reversibly erred by instructing the jury on the word "knowingly" in a way that "substantially deviated from the statutory definition, was misleading, inaccurately stated the law, and lowered the prosecution's burden to prove every element — including the mens rea — of each offense beyond a reasonable doubt."

### 1. Preservation and Standard of Review

¶ 49 The People contend that defense counsel only objected to the inclusion of the word "well-being" in the instructions and therefore did not preserve Ramcharan's challenge to the court's instruction defining the word "knowingly."

¶ 50 Objections must be "specific enough to draw the trial court's attention to the asserted error." *People v. Tallent*, 2021 CO 68, ¶ 12, 495 P.3d 944, 948 (quoting *Martinez v. People*, 2015 CO 16, ¶ 14, 344 P.3d 862, 868). The record confirms that defense counsel did not specifically draw attention to the asserted error in the court's definition of "knowingly" because he only objected to the inclusion of "well-being" in the definition. In contrast to his counsel's objection at trial, on appeal Ramcharan contends that the trial court's definition of "knowingly" is inconsistent with the statutory definition. § 18-1-501(6), C.R.S. 2024.

¶ 51 "We review de novo whether the jury instructions as a whole accurately informed the jury of the governing law." *People v. Manyik*, 2016 COA 42, ¶ 65, 383 P.3d 77, 89. "However, we review the trial court's decision regarding whether to give a particular jury instruction for an abuse of discretion." *Id.* "A jury instruction

20

should substantially track the language of the statute describing the crime; a material deviation from the statute can result in reversible plain error, depending on the facts of the case." *People v. Weinreich*, 119 P.3d 1073, 1076 (Colo. 2005). We review not only whether the jury instructions faithfully tracked the law but also whether they were confusing or may have misled the jury. *Garcia v. People*, 2022 CO 6, ¶ 16, 503 P.3d 135, 140 (citing *People v. Janes*, 982 P.2d 300, 303-04 (Colo. 1999)).

¶ 52 We review all unpreserved nonstructural errors, including errors in jury instructions, for plain error. *See Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120. We reverse under the plain error standard of review only if the error was obvious and substantial, meaning it "so undermined the fundamental fairness of the [proceeding] itself as to cast serious doubt on the reliability" of the outcome. *People v. Crabtree*, 2024 CO 40M, ¶ 43, 550 P.3d 656, 667 (quoting *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987)).

### 2. Ramcharan Did Not Waive His Challenge to the Instructional Error

¶ 53 As a threshold matter, the People argue that Ramcharan waived his instructional error argument because defense counsel

"agreed to the 'substance' of the proposed instructions as a whole" and "his objection was limited to a singular request that the word 'well-being' be removed." We disagree that such actions constituted a waiver.

¶ 54 Whether a party waived an argument is a question of law that we review de novo. *Richardson v. People*, 2020 CO 46, ¶ 21, 481 P.3d 1, 5. Waiver is the "*intentional* relinquishment of a *known* right or privilege." *People v. Rediger*, 2018 CO 32, ¶ 39, 416 P.3d 893, 902 (quoting *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984)).

¶ 55 As Ramcharan asserts, "there is no evidence in the record that [counsel] intentionally relinquished his right to have the jury correctly instructed on the definition of 'knowingly,'" even if his counsel did not specifically object to that definitional instruction. The facts in this case are similar to those in *Rediger*, where defense counsel not only did not specifically object to the challenged instruction but confirmed he was "satisfied with the instructions," and the record did not indicate that "the court or the parties discussed that instruction." *Rediger*, ¶ 10, 416 P.3d at 898. The supreme court held that, on such facts, there was "no evidence,

either express or implied, that Rediger intended to relinquish his right." *Id.* at ¶ 42, 416 P.3d at 902. "For example, the record contains no evidence that Rediger considered objecting to the erroneous instruction but then, 'for some tactical or other reason, rejected the idea.'" *Id.* (citation omitted). So, too, in this case.

¶ 56    Therefore, Ramcharan did not waive his instructional error argument.

### 3.    The Court Erred by Providing an Instruction with an Incorrect Definition of "Knowingly"

¶ 57    We agree with Ramcharan that the court's instruction incorrectly defined "knowingly." (The People concede that the instruction "did not wholly track the statutory definition of 'knowingly' or the pattern jury instruction.")

¶ 58    To prove both sexual assault on a child and contributing to the delinquency of a minor, a prosecutor must prove beyond a reasonable doubt that the defendant acted knowingly. *See* § 18-3-405(1) ("Any actor who *knowingly* subjects another not his or her spouse to any sexual contact commits sexual assault on a child if the victim is less than fifteen years of age and the actor is at least four years older than the victim.") (emphasis added); *see also*

23

*Gorman v. People*, 19 P.3d 662, 665 (Colo. 2000) ("[T]he culpable mental state of *knowingly* applies to the act of contributing to the delinquency" of a minor.) (emphasis added).

¶ 59     Section 18-1-501(6) defines "knowingly" as when a person "is aware that his conduct is of such nature or that such circumstance exists . . . [and] when he is aware that his conduct is practically certain to cause the result."  *See also* COLJI-Crim. F:195 (2023) (pattern jury instruction F:195 defines "knowingly" as "when he [she] is aware that his [her] conduct is of such nature or that such a circumstance exists . . . [and] when he [she] is aware that his [her] conduct is practically certain to cause the result").

¶ 60     The court's definition of "knowingly," however, did not "substantially track the language of the statute" or that of the pattern instruction.  *Weinreich*, 119 P.3d at 1076.  While section 18-1-501(6) refers to "aware[ness] that [the defendant's] conduct is of such nature or that such circumstance exists," the court's instruction said that "knowingly" referred to "the actor's *general* awareness of the nature of his conduct *in relation to the child* or his awareness of the circumstances *in which he commits an act against the well-being of the child*."  (Emphasis added.)  The court added the

24

qualifier "general" before "awareness" and materially deviated from the statutory definition by specifying that the subject conduct must be *in relation to* the child or the defendant's awareness of the circumstances in which his act impacts the child's well-being. *See People v. Mendez*, 897 P.2d 868, 871 (Colo. App. 1995) ("The modification, expansion, or clarification of the definition of a term defined by statute is not recommended, especially when the definitions have been approved by the supreme court for use in criminal proceedings.").

¶ 61 In addition, the court's instruction lacked the statutory language that the person is "aware that his conduct is practically certain to cause the result." § 18-1-501(6). This is a material — and significant — omission from the language the General Assembly chose to include in the definition.

¶ 62 For these reasons, the court erred by incorrectly defining "knowingly" — the mens rea element for both of the charged offenses.

### 4. The Instructional Error Was Obvious

¶ 63 An error is obvious if it is "so clear-cut" that "a trial judge should be able to avoid it without benefit of objection." *Crabtree,*

¶ 42, 550 P.3d at 667 (quoting *Romero v. People*, 2017 CO 37, ¶ 6, 393 P.3d 973, 976).  Consequently, an error is obvious if it "contravene[d] a clear statutory command, a well-settled legal principle, or established Colorado case law." *Id.*  We agree with Ramcharan that the error here was obvious.

¶ 64     First, as described in Part II.B.3 above, the instruction contravened the clear language of section 18-1-501(6).

¶ 65     Second, as the People note, "[i]t appears that the instruction's language derived from *People v. Noble*, 635 P.2d 203 (Colo. 1981), a felony child abuse case applying a former version of the child abuse statute."  But the General Assembly enacted material amendments to the child abuse statutes after the supreme court decided *Noble*.  *Compare* § 18-6-401(1), C.R.S. 1978, *with* § 18-3-405(1), (2)(a), C.R.S. 2024.  Thus, the instructional error contravened a clear statutory command and Colorado case law, and was therefore obvious.  *See Crabtree*, ¶ 42, 550 P.3d at 667.

5.     The Instructional Error Was Not Substantial

¶ 66     An error is substantial if, as noted above, it "so undermined the fundamental fairness of the trial itself as to cast serious doubt

26

on the reliability of the judgment of conviction." *Id.* at ¶ 43, 550 P.3d at 667 (quoting *Wilson*, 743 P.2d at 420).

¶ 67    "[A]n erroneous jury instruction does not normally constitute plain error . . . where the record contains overwhelming evidence of the defendant's guilt." *Thompson v. People*, 2020 CO 72, ¶ 54, 471 P.3d 1045, 1057 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)); *see also Espinoza v. People*, 712 P.2d 476, 478-79 (Colo. 1985).

¶ 68    The People contend that the error was not substantial because the evidence against Ramcharan was overwhelming.  We agree.

¶ 69    Turning first to the charge of sexual assault on a child, no evidence contradicted A.M.'s testimony that Ramacharan put his penis in her vagina.  Indeed, in his interview with Detective Collins, Ramcharan admitted that he "started to" have sex with A.M.  The jury watched the video of Ramcharan's interview with Detective Collins and the prosecutor showed the jury a transcript of the interview.

¶ 70    Furthermore, the nurse who examined A.M. following the alleged sexual assault testified at trial that A.M.'s genitalia were inflamed and torn, consistent with sexual activity.  Although the

27

nurse agreed on cross-examination that such injuries could occur through consensual sex, and Ramcharan told Detective Collins that "everything that happened [with A.M.] was completely consensual," Ramcharan could not avoid conviction by arguing that A.M. — a fourteen-year-old girl — consented to engage in sex with him. *See People v. Hodge*, 2018 COA 155, ¶ 16, 488 P.3d 436, 439-40 ("[C]hild sexual assault . . . recognizes that a child cannot legally consent to sexual contact or to any conduct that facilitates that sexual contact.").

¶ 71 Lastly, the male Y-STR profile was consistent with Ramcharan's genetic material, with an expected frequency of "1 in 2,007 individuals." *Cf. People v. Brown*, 2014 COA 155M-2, ¶¶ 7, 13, 360 P.3d 167, 170-71 (holding there was no reversible error when an "expert testified that certain Y-STR profiles obtained from the crime scene matched defendant's profile").

¶ 72 Overwhelming evidence also supported Ramcharan's conviction for contributing to the delinquency of a minor premised on his act of forcing A.M. to smoke methamphetamine. As noted above, officers found in the jacket Ramcharan had been wearing on the day of the sexual assault the white pipe that A.M. said

Ramcharan forced her to smoke, containing the very type of residue that A.M. had described. At trial, the prosecutor introduced into evidence a photograph of the pipe, containing residue, on top of the jacket and next to Ramcharan's driver's license.

¶ 73 Ramcharan disagrees that the evidence against him was overwhelming. He argues that his admission that he "started to" have sex with A.M. was vague and could encompass conduct that did not constitute sexual assault on a child. In addition, he challenges the People's contention that the DNA analysis "strongly tied" Ramcharan to the crime because an expert witness who testified for the prosecution opined that the analysis showed only that Ramcharan "could not be excluded from" the profile.

¶ 74 But Ramcharan does not demonstrate how the erroneous definition of "knowingly" undermined "the fundamental fairness" of his trial, particularly as his theory of defense was a general denial of the charges. *Crabtree*, ¶ 43, 550 P.3d at 667 (quoting *Wilson*, 743 P.2d at 420). Although Ramcharan contends that the instructional error "relieved the prosecution of its burden of proving each element of each offense beyond a reasonable doubt," such argument is conclusory and does not overcome the undisputed,

overwhelming evidence in the record. *See People v. Wallin*, 167 P.3d 183, 187 (Colo. App. 2007) (declining to address arguments presented in a perfunctory or conclusory manner).

¶ 75   For these reasons, we hold that the court's instructional error was not plain and, therefore, does not warrant reversal.

## C.   Requests for Substitute Counsel

¶ 76   Ramcharan contends that the court reversibly erred by denying his multiple requests for substitute counsel because he and his counsel had an irreconcilable conflict. We disagree.

### 1.   Additional Facts

¶ 77   A public defender initially represented Ramcharan; he was later represented by alternate defense counsel. Ramcharan asked the court twice to discharge his public defender and thrice to discharge alternate defense counsel. The court conducted five ex parte hearings across a two-year period, over which four judicial officers presided, to consider Ramcharan's requests. (A court must conduct a hearing, at which both attorney and client may testify, to adjudicate a defendant's assertion that his appointed attorney cannot or will not completely represent him. *People v. Bergerud*, 223 P.3d 686, 694-95 (Colo. 2010).)

¶ 78    In his first motion for new counsel, Ramcharan complained that his public defender was not communicative and that there was a "lack of trust" between them.  The public defender responded that Ramcharan did not want her honest assessment of his case.  Ramcharan further asserted that he disagreed with the direction she was taking in developing a defense strategy.  Specifically, he told the court he wanted to pursue defenses resting on his ignorance of A.M.'s age, which he attributed, in part, to a recent eye injury.  The public defender had told him "several times" that his assertions would not support a defense.

¶ 79    At a *Bergerud* hearing in November 2020, the court found that these facts did not establish a breakdown in communication between Ramcharan and his public defender.  The court explained to Ramcharan that, "whether or not you agree with the way [your lawyer] is formulating this case . . . , she gets to make the decision." (Ramcharan later apparently wanted his lawyer to argue that the eye injury rendered his statements to the officers involuntary.)

¶ 80    Two months later, Ramcharan filed a second motion for new counsel that rehashed the arguments in his first motion.  But following the *Bergerud* hearing on the second motion, the court

found that there had been a breakdown in communication between the public defender and Ramcharan, discharged the public defender, and appointed alternate defense counsel for him.

¶ 81 Five months later, Ramcharan moved to dismiss his new counsel. Ramcharan complained that his new lawyer, like his former lawyer, was not pursuing a defense relating to his eye injury, which he said demonstrated that he had "unknowingly" had sex with a child. Ramcharan also told the court that his new counsel did not believe he had a defense and "causes doubt" and trust issues, and that, as a result, Ramcharan "didn't want to speak to him." Counsel responded that, because Ramcharan was refusing to speak to him, "his ability to communicate with Ramcharan had deteriorated to the point that he couldn't effectively represent him." Following another *Bergerud* hearing, the court found that "this is largely a situation where there is a significant difference in . . . defense strategy," which is not grounds to appoint new counsel, and denied Ramcharan's request.

¶ 82 Less than two weeks later, Ramcharan again told the court that he and his new counsel had a complete breakdown in

communication and that the court should appoint a new lawyer for him. The court conducted a fourth *Bergerud* hearing.

¶ 83 At the hearing, counsel "conceded that he missed an appointment he had scheduled with Ramcharan to get a release for hospital records" relating to the eye injury. Ramcharan said he had lost trust in the lawyer as a consequence. Nevertheless, the court again denied Ramcharan's request for new counsel. During the hearing, the court advised Ramcharan of his right to represent himself. Ramcharan said he did not want to do so.

¶ 84 In November 2021, the court held a fifth *Bergerud* hearing after Ramcharan again requested new counsel. Ramcharan and his counsel both told the court that their communications had broken down. In addition, Ramcharan continued to emphasize his belief that the eye injury was critical to his defense, as he claimed it impacted the voluntariness of his statements to the officers. Defense counsel told the court that he disagreed with Ramacharan regarding the relevance of the eye injury and said that Ramcharan would not accept his explanation that mistake as to the victim's age is not a defense to a sexual assault on a child charge. The court observed that "[t]he problem for me is that no matter who tells him

33

that his defense is not viable, he's not going to believe it."  The court

again denied Ramcharan's request to appoint new counsel.

2.     Standard of Review and
the Law Governing a Defendant's Request
to Discharge Counsel

¶ 85     "A defendant's motion to discharge an attorney is addressed to

the sound discretion of the trial court, and its ruling will not be

disturbed on review absent an abuse of discretion."  *People v.*

*Bostic*, 148 P.3d 250, 259 (Colo. App. 2006).  "Before change of

counsel is warranted the trial court must verify that the defendant

has 'some well founded reason for believing that the appointed

attorney cannot or will not completely represent him.'"  *People v.*

*Arguello*, 772 P.2d 87, 94 (Colo. 1989) (quoting 2 Wayne R. LaFave

& Jerold H. Israel, *Criminal Procedure* 37 (1984)).

¶ 86     "When an indigent criminal defendant voices objections to

court-appointed counsel, the trial court must inquire into the

reasons for dissatisfaction.  If the defendant establishes good cause,

such as a conflict of interest or a complete breakdown of

communication, the court must appoint substitute counsel."  *People*

*v. Apodaca*, 998 P.2d 25, 28 (Colo. App. 1999).  "Conversely, if the

court has a reasonable basis for concluding that the attorney-client

34

relationship has not deteriorated to the point where counsel is unable to give effective assistance, the court is justified in refusing to appoint new counsel." *Id.*

### 3. The Court Did Not Abuse Its Discretion by Denying Ramcharan's Requests for New Counsel

¶ 87 The transcripts of the five *Bergerud* hearings demonstrate that the court did not abuse its discretion by rejecting all but one of Ramcharan's requests to discharge his lawyer and appoint new counsel for him. Rather, the record underscores that the court correctly found that the difficulty in the communications between Ramcharan and his lawyers primarily rested on their disagreements regarding the relevance of Ramcharan's eye injury. As the court noted, case strategy is a matter left to counsel. *Bergerud*, 223 P.3d at 693 ("On issues of trial strategy, defense counsel is 'captain of the ship.'" (quoting *Arko v. People*, 183 P.3d 555, 558 (Colo. 2008))).

¶ 88 Further, because a "source of limitations on an attorney's actions is that these decisions of trial strategy are held to a standard of professional reasonableness," *id.* at 694, the court correctly found that Ramcharan's lawyers did not pursue

Ramcharan's desired strategy regarding the eye injury because such strategy could not support a valid defense.

¶ 89 Because the purported conflict primarily arose from Ramcharan's mistaken belief that he could dictate the legal strategy his lawyers pursued and his resulting refusal to cooperate with them, there was no basis for appointment of new counsel. *See People v. Kelling*, 151 P.3d 650, 653 (Colo. App. 2006) ("Disagreements pertaining to matters of trial preparation, strategy, and tactics do not establish good cause for substitution of counsel."); *see also People v. Hodges*, 134 P.3d 419, 425 (Colo. App. 2005) ("Neither the existence of animosity between defendant and [the lawyer] nor [the lawyer's] asserted disagreement with defendant regarding the strength of defendant's case constitutes an actual conflict of interest requiring the appointment of substitute counsel."), *aff'd on other grounds*, 158 P.3d 922 (Colo. 2007).

¶ 90 For these reasons, we hold that the court did not abuse its discretion by denying Ramcharan's requests that the court discharge his lawyers and appoint new counsel for him.

## III. Disposition

¶ 91    The judgment of conviction is affirmed.

JUDGE SCHUTZ and JUSTICE MARTINEZ concur.